PEOPLE *v.* BARKER.

1. CRIMINAL LAW—CROSS-EXAMINATION OF PEOPLE'S EXPERT—STAINS.

In prosecution for murder, where people's expert from scientific laboratory stated that hole in the back of the dress was the point of entry of the bullet and hole in the front of the dress was the point of exit, but repeatedly denied that he knew whether stains on the dress were bloodstains, court's restriction of defendant's counsel in cross-examination of such expert by questions as to whether the stains were of blood and referring jury to dress *held*, not improper.

2. SAME—SELF-DEFENSE—EXPERT WITNESSES—IMPEACHMENT.

Preventing defense in prosecution for murder from impeaching people's expert witness, who had testified from bullet holes in victim's dress as to direction from which shot was made, by expert's previous testimony on the preliminary examination, *held*, not reversible error, where testimony sought to be admitted is not shown to be contrary to his testimony on the trial and the question was unimportant in view of the absence of proof of self-defense.

3. HOMICIDE—SELF-DEFENSE—EVIDENCE.

Where defendant in prosecution for murder had testified absolutely that she did not kill the victim and in her statement to prosecutor that she did not know what had happened, whether victim was shot in the front or back of leg was of no probative value with regard to claim of self-defense.

4. CRIMINAL LAW—MURDER—PHOTOGRAPHS OF BLOODSTAINS—ARGUMENT OF COUNSEL.

In closing argument of prosecuting attorney in prosecution for murder, permission to argue as to location of bloodstains on the snow as shown by photographs of the scene of the shooting taken day after it occurred, without calling jury's attention to fact as to when they were taken, was not error where jury was advised as to when pictures were taken when they were introduced in evidence.

Per BUSHNELL, C. J., and POTTER, CHANDLER, MCALLISTER, and BUTZEL, JJ.

5. SAME—CROSS-EXAMINATION—GUNS—HOMICIDE—BAD FAITH.
Display of gun on cross-examination of defendant, which was in no way connected with murder with which defendant was charged, and cross-examination of defendant with respect thereto *held*, not reversible error, in the absence of a showing of bad faith, where later, at the request of the prosecuting attorney, such matter was stricken.

6. HOMICIDE—SELF-DEFENSE—MANSLAUGHTER—EVIDENCE.
In prosecution for murder of defendant's business associate in which defendant claimed homicide was committed in self-defense, record *held*, to disclose ample testimony to sustain a verdict of manslaughter.

Appeal from Wayne; Jayne (Ira W.), J. Submitted October 12, 1940. (Docket No. 136, Calendar No. 40,249.) Decided April 1, 1940. Rehearing denied June 18, 1940.

Julia M. Barker was convicted of manslaughter. Affirmed.

*Thomas Read,* Attorney General, *Duncan C. Mc-Crea,* Prosecuting Attorney, *William E. Dowling,* Chief Assistant Prosecuting Attorney, and *William L. Brunner* and *John A. Ricca,* Assistants Prosecuting Attorney, for the people.

*Kelly, Kelly & Kelly* and *Lawrence Kelly,* for defendant.

McALLISTER, J. I am unable to concur in the view that there was reversible error on the trial of this case. Complaint is made that the trial court improperly restricted defendant's counsel in his cross-examination of James F. Payne, a witness from the scientific laboratory of the detective bureau of the Detroit police department. Payne testified that the hole in the back of the dress was the point of entry

of the bullet and that the hole in the front was the point of exit. He further testified that the condition of the dress was different at the time of the trial from what it was when he had examined it some days after the shooting. On the question of bloodstains on the dress, he testified that he did not know, and could not know, whether the stains on the dress were bloodstains, because he had not submitted the stains to a chemical examination.

Defense counsel's persistent questions were concerned with Payne's knowledge of whether the stains were of blood, and with requests to the witness to point out bloodstains to the jury. Confusion was introduced by counsel's reference to the stains as bloodstains and inquiries as to whether the witness had seen such bloodstains. The answer of the witness was that there was less blood at the point of entrance than at the point of exit; but he immediately followed this statement by the further answer that he did not know that the marks were bloodstains. In view of the repeated and definite statements of the witness that he did not know whether such stains were bloodstains, the continuance of the examination of the witness along such lines was bound to result in repetitious explanations by the witness and confusion to the jury. We find no error in the statement made by the court clearing up the question from the morass of such interrogations, objections, and colloquies, when the trial judge said:

"The dress is an exhibit. The jury may look it over if they desire to, for their own information. It is an exhibit and I think it is clear on the record now which hole this witness says the bullet went in and which hole the witness says it went out, and any time that the jury here are confused on it, I will see that they get the information."

With regard to the alleged error of the court in preventing the defense from impeaching the witness Payne by his previous testimony on the preliminary examination, we find no reversible error. The testimony sought to be used for purposes of impeachment did not indicate that the witness had testified to the contrary on the trial; and although there might be implications that his memory was poor with regard to his testimony on the examination, there was nothing therein to contradict or impeach his testimony on the trial of the case. In view of the circumstances of the case, as we shall hereafter point out, the question was unimportant; and the statement of defendant's counsel that he would be unable to cross-examine the witness if the prosecution was going to take the position that the dress was not in the same condition at the time of the trial as it was at the time of the examination appears to justify the court in its rulings with regard to the matters complained of, for there was no question that it was the contention of the prosecutor and the claim of the witness that there had been a change in the condition of the dress.

But the important fact, as bearing upon the complaint of defendant with regard to the foregoing, was the absence of any proof of self-defense. If defendant did not kill in self-defense, it was unimportant where the stains were on the dress, or whether they were bloodstains, or whether deceased was shot in the front or back of the leg.

In the statement which defendant made to the prosecuting attorney at the time of her arrest, which was introduced in evidence on the trial, and which counsel for defendant insists was the truth, it appears that the following questions were asked by the prosecutor and answered by the defendant:

"*Q.* After you had walked down this path, how far had you gone before anything else happened?

"*A.* Well, I slipped, or cut through the crust of ice, and my shoe got caught, and Mrs. Cummings went on ahead of me, and when we got just to the other side, why, she turned around, and let me go ahead of her, and at that time we were just at the—going up over the top of the hill, on the other side, to where—of the ravine, and she grabbed my leg, and pulled me down off of the ravine, and she had this gun. She pointed it at me, and said that we were all through, we might as well recognize we were all through, that she just couldn't cover up her checks any longer, and the thing for us to do was to go out, and there was quite a bit of conversation, and *I hit the gun that she had over to one side, and it went on the snow, and we both rumpused, tried to get the gun,* and that is the way the thing happened.

"*Q.* Well, you say there was quite a lot of conversation. Just try to tell me as near as you can, just all the conversation you had before the gun, you say, went out of her hands.

"*A.* Well, I screamed and yelled and yelled for help, as loud as I could yell, and she tried to put her hands over my mouth, keep me from yelling. I was on the snow at that time.

"*Q.* You mean you were lying down, in place of standing?

"*A.* Yes; that is when she pulled my leg.

"*Q.* And you say she tried to put her hand over your mouth?

"*A.* Yes, she did.

"*Q.* Which hand?

"*A.* Oh, I don't know which hand.

"*Q.* Where was the gun then?

"*A.* Well, we were battling for it. * * *

"*Q.* Now, you say that you were down on the ground, when you were screaming, and that Mrs.

Cummings was trying to put her hand over your mouth, is that right?

"*A.* That is right.

"*Q.* How far were you from the gun then?

"*A.* I don't know. We were battling. She had— we were battling back and forth there on the ground for quite some time, and I was yelling at the top of my voice. * * *

"*Q.* Well, you were battling in the snow there, to see which one could get the gun; then what happened?

"*A.* And then I pulled myself up on the bank, and started to cross the country to the nearest farm house.

"*Q.* Well, didn't you get a hold of the gun first?

"*A.* I don't know what happened.

"*Q.* You don't know?

"*A.* I just don't know. I just battled, and I was just like insane. I didn't know what in the world was the matter.

"*Q.* You don't know whether you got the gun or not?

"*A.* No, I don't.

"*Q.* You don't remember whether you fired any shots out of it?

"*A.* No, I do not.

"*Q.* Well, after you were battling there in the snow, and you started to go away, where was Mrs. Cummings then?

"*A.* I don't know. She was laying in the snow. * * *

"*Q.* Well, you heard the gun go off, didn't you?

"*A.* Oh, I think I did. I don't know what all happened. * * *

"*Q.* And Mrs. Barker, you killed Mrs. Cummings, didn't you?

"*A.* Not to my knowledge.

"*Q. Isn't it a fact that you had this gun, and that you shot her with it?*

"*A. It is not.* * * *

"*Q.* Isn't it a fact, Mrs. Barker, that you took this gun and you killed Mrs. Cummings because you were angry at her because she talked too much?

"*A. I did not.*

"*Q.* Isn't that right?

"*A. Positively not.*

"*Q.* Isn't it a fact that after you shot Mrs. Cummings, that you got on top of her with a gun this way and pounded her head time after time with that gun, isn't that true?

"*A.* Not to my knowledge.

"*Q.* Not to your knowledge. You wouldn't say that it isn't true?

"*A. I say positively that I never did such a thing.*

"*Q.* You never hit her with the gun after you had shot her?

"*A.* Not to my knowledge.

"*Q.* Now, I want you to remember as nearly as you can everything that happened. Isn't it a fact that you were the one that led Mrs. Cummings out there, and you took her there for the purpose of killing her with this gun?

"*A.* That is not true. * * *

"*Q.* Well, when you left the body of Mrs. Cummings, she didn't move, did she?

"*A.* I don't know.

"*Q.* You didn't see her move, did you?

"*A.* I don't know.

"*Q.* Well, did you or didn't you? You were there?

"*A.* I don't know. * * *

"*Q.* And you carried this gun 600 feet from where you had killed Mrs. Cummings, and left it at the same place you burned the fire?

"*A.* I don't remember. * * *

"*Q.* Now, it is your claim that you don't remember whether you grabbed this gun out of the snow or not, is that it?

"*A.* I don't know how I got the gun, *or if I got the gun.*

"*Q.* When did you start to remember what had happened?

"*A.* I don't know. * * *

"*Q.* You didn't try to get any help, though, to send back, to see whether or not Mrs. Cummings was killed, did you?

"*A.* I didn't do anything.

"*Q.* You never told anybody where she was?

"*A.* I didn't see anybody.

"*Q.* You didn't tell anybody that she might not be killed, that she might be injured, lying there in the snow?

"*A.* I didn't know whether she was killed or not, until I came into your office.

"*Q.* The reason you didn't tell anybody that she was there, injured, is because you did know she was killed?

"*A.* I did not. I take an oath to God.

"*Q.* How many times did you shoot her?

"*A.* I don't know.

"*Q.* More than once?

"*A.* I don't know. I don't know what happened. * * *

"*Q.* And you want to still say that your story is true, and all those other stories are false?

"*A.* I don't know what the stories are.

"*Q.* I have told you, haven't I? I have told you of a witness seeing you hit Mrs. Cummings over the head with a gun, after you had shot her, and on top of her, pounding her.

"*A.* I don't know anything about that.

"*Q.* Do you still want to say that is not true?

"*A.* Not to my knowledge. I don't know what happened."

Defendant was a witness on her own behalf. She testified:

"I will tell the world I didn't shoot Mrs. Cummings—I didn't want to shoot her, and I wouldn't shoot her."

Defendant further testified that she struggled with the deceased for the gun, *so that she could get it and throw it away.*

If defendant's *testimony* is to be believed, she did not kill the deceased; and her statement to the prosecutor is to the same effect and indicates nothing that did show that she killed in self-defense. According to her testimony, she had knocked the gun out of the hand of deceased, and it had fallen in the snow. There is no claim on the part of the defendant that Mrs. Cummings thereafter recovered the gun, or that she herself secured the gun, or that she was in fear of her life or great bodily danger thereafter, or that she killed in self-defense. The most that can be said of defendant's claim is that, on the one hand, she testified absolutely that she did not kill Mrs. Cummings; and, on the other hand, in her statement to the prosecutor, she said that she did not know what happened. Under such proofs the question of whether deceased was shot in the back of the leg or the front of the leg is of no probative value with regard to the claim of self-defense now urged by defendant's counsel.

Much is said of the improper use by the prosecutor of photographic exhibits in the following part of his closing argument to the jury:

"Well, here are a couple exhibits, ladies and gentlemen. One of them is people's exhibit 41. And you heard the witness testify about the blood spot up here and the blood spot down there (indicating). Of course, a body couldn't have rolled down there, says Mr. Kelly.

"*Mr. Kelly:* What photograph—

"*Mr. McCrea:* It has been exhibited and you saw it.

"*Mr. Kelly:* Wait. So the jury won't be confused. What date was that—

"*Mr. McCrea:* Never mind, Mr. Kelly. You had a chance to argue this.

"*Mr. Kelly:* I want the jury to understand it.

"*Mr. McCrea:* Will you please not interrupt unless you have a legal objection?

"*Mr. Kelly:* O. K. Go ahead.

"*Mr. McCrea:* So he says, 'Why, the body couldn't have slid down head first.' But then we take people's exhibit 47, and again we see the two spots from different angles.

"*Mr. Kelly:* Now, wait, if the court please. I object because of the fact that—

"*Mr. McCrea:* Wait a minute. I am going to ask the jury be excluded if you want to make speeches again.

"*Mr. Kelly:* No, no.

"*Mr. McCrea:* Wait—

"*The Court:* Wait a minute, Mr. Prosecutor.

"*Mr. Kelly:* I object because the photographs that are being introduced by the prosecutor at this time, purporting to show the facts as to how the ground was on January 15th are photographs—

"*Mr. McCrea:* I am going to object to that as improper, if your honor please. The jury heard those exhibits introduced.

"*The Court:* Wait a minute. Mr. Kelly, I don't think this is a proper interruption for you to go on and make an argument at this time. Those photographs are in evidence. The jury heard when and by whom they were taken, and the prosecutor has a right to argue from them, as you were permitted to argue from them. Then the jury can look at them when their time comes, and it will be their responsibility to make up their minds what significance there is, if any, to any of the marks.

"'They are in evidence. You were permitted to argue about them, and I will now let the prosecutor argue his theory on them.''

Nothing more was said in the argument about the

photographs in question. These photographs pur-
ported to show spots of blood on the snow at the
scene of the killing. There was no attempt, as con-
tended by the defense, to argue to the jury that
these photographs purported "to show the facts as
to how the ground was on January 15th." They did
not purport to show such facts; they were taken the
following day. Approximately 50 photographs were
introduced. Some of these were taken on the day of
the shooting and some thereafter; some showed the
general location of the place where Mrs. Cummings
body was found; others showed what purported to be
bloodstains on the snow; others, the physical con-
tour of the land; and others, the location and posi-
tion of the body of the dead woman. When they
were introduced in evidence, the jury was advised
with regard to the time when the pictures were
taken. There appears to have been no use of the
photographs in question except to show the blood
stains on the snow. They were not used to show the
general conditions at the place where death oc-
curred. The defense did not ask the court for any
instructions with regard to the matter. Under the
circumstances, it was not entitled to have the court
interrupt the closing argument to call attention to
the date when the photographs were taken. We are
unable to see how the jury was confused, or the
defendant prejudiced, as a result of the conduct of
the prosecutor or the ruling of the court; and we
find therein no grounds for reversing the conviction.

Upon this record, the verdict of the jury con-
victing defendant of manslaughter should not be
reversed because of claimed errors in cross-examina-
tion as to where the bloodstains were located on the
dress of deceased; nor should the conviction be re-
versed because of reference to the photographs by
the prosecutor in his final argument.

We concur in Mr. Justice NORTH's determination of other claimed errors in the accompanying opinion; and find nothing to warrant a reversal of conviction.

Judgment affirmed.

BUSHNELL, C. J., and POTTER, CHANDLER, and BUTZEL, JJ., concurred with MCALLISTER, J.

NORTH, J. (*dissenting in part*). Julia M. Barker was charged with having committed the crime of murder by shooting Mrs. Edith Mae Cummings on the 15th day of January, 1938. On trial by jury in the circuit court of Wayne county she was convicted of manslaughter. Defendant contends that if she shot Mrs. Cummings it was incident to a personal encounter and done in self-defense. On her appeal to this court she charges that numerous errors were committed on the trial of the case and that in consequence thereof she is entitled to have her conviction set aside, and that she be discharged from custody or in the alternative be granted a new trial.

In view of our decision herein it is unnecessary to advert to very many details which the record discloses led up to the commission of the alleged offense. For a number of years the defendant and Mrs. Cummings had been associated in business transactions; and they had become badly involved financially. As a result of some of their dealings with parties residing in Kentucky, both defendant and Mrs. Cummings were being pressed and threatened with legal proceedings in the Kentucky courts. Just prior to Mrs. Cummings' death these two made a trip to Kalamazoo, where they separated. Mrs. Cummings went to Chicago and Mrs. Barker went to Lawton, Michigan. They met again at Kalamazoo on the 14th of January, and apparently on a

return trip to Detroit proceeded by automobile to Ypsilanti where they remained all night. On the morning of January 15th they left Ypsilanti together, Mrs. Cummings driving the automobile. They proceeded in a southeasterly direction to a point on the Chase road in the westerly part of Wayne county and not a great distance north of Belleville. In taking this course the parties were endeavoring to contact a man whom they thought might cash a mortgage held by defendant. Conditions for travel were bad on the Chase road and ultimately Mrs. Cummings stopped the automobile at the side of the road. From there they proceeded in a southerly and easterly direction across a field covered with three or four inches of snow and then up to the top of a hill. From this point they went 400 feet in an easterly direction. They then retraced their steps for these 400 feet and went a little distance down the hill to the point where the shooting occurred. It was at this point that the defendant claims that she was assaulted by Mrs. Cummings, that a physical encounter occurred in which each of the parties strove to get possession of the gun with which the shooting was done. Defendant claims that the weapon in the first instance was in the possession of Mrs. Cummings, and in the course of the struggle the shot was fired which resulted in Mrs. Cummings' death. The wound was in the thigh of the left leg of deceased. It is a controverted issue whether the bullet passed from the front to the rear or from the rear to the front. In its course it severed the femoral vein, and death followed from shock and loss of blood.

One of the errors urgently insisted upon by defendant is that the cross-examination of James F. Payne, an expert witness for the prosecution, was

improperly restricted. The seriously important part of the testimony of this witness was its bearing upon whether the bullet passed from the front to the rear or from the rear to the front of the limb of deceased. This had an important bearing upon defendant's theory of self-defense. This witness on direct examination testified that in his opinion the bullet passed from the rear to the front. On his cross-examination defendant's counsel sought to develop the facts and the reason upon which the conclusion of the witness was based. In response to questions by defendant's counsel the witness testified "that there was less blood at the point of entrance than at the point of exit." Upon being further cross-examined he testified as follows:

"*Q*. Does that garment show more blood around your designated point of entrance than it does around your designated point of exit?

"*A*. I can't answer that for the good reason that I did not test it for blood and without testing it and running a precipitant test on it at the time it was done, I would not expect that it was even blood on there, and no one directly can say it.

"*Q*. When you saw the dress there was less blood at the point of entrance than at the exit?

"*A*. That is correct."

Notwithstanding the garment was in evidence, the trial court refused defendant's counsel permission to have the witness point out to the jury by using the garment whether there was more blood or stain on the front of the garment than on the rear. And notwithstanding the witness' testimony that he did not know whether the stains on the garment were blood stains, defendant's counsel was not permitted to cross-examine him as to contradictory evidence given by the witness on examination before the mag-

istrate. This was squarely brought before the court by the following question to which the prosecuting attorney's objection was sustained:

"*Q*. You don't believe you did. Was this question asked you at the examination: '*Q*. Now, will you tell the court in your own way why you are able to testify that this bullet entered in the left rear of that coat and dress?' And did you make this answer: '*A*. From the speed of this bullet as it leaves the muzzle of the gun, which is an average of 1,040 feet a second, as that bullet hits into the coat it cut straight through the coat, also cut the lining out, so that the bullet will fit in there where it went in the coat where it burned through, as it came through, that left a clean entrance and where it entered the dress it was cut in a similar manner, and where it came out it was large, showing the exit and showing blood on the exit of the bullet. Because a bullet travelling at the speed it was travelling and hitting at close range is travelling through so fast that there was no blood on the entrance of the bullet. It went through the clothing so quick that when it comes out it tore through and brought blood out with it.' Do you remember making that answer?''

As noted above, the circuit judge sustained the prosecutor's objection to this cross-examination; and in the jury's presence he stated that the witness' previous testimony was not impeaching. However, it is plain to be seen that on his examination before the magistrate and also in his earlier testimony on this trial the witness denominated the stains as bloodstains. But later on in the trial of the case he took the position he did not know whether the stains were bloodstains; and seemingly for that reason the trial judge refused defendant's counsel the right to have the witness point out to the jury whether or not the condition of the garment justified or tended

to sustain his expert opinion that the bullet passed from the rear to the front. This, we think, was a prejudicial restriction of defendant's right to cross-examine and constitutes reversible error. As bearing upon the importance of this phase of the record, it should be noted the prosecuting attorney repeatedly stressed before the jury his claim that Mrs. Cummings was shot from the rear; and in taking this position the prosecution was refuting defendant's theory of self-defense.

Appellant also asserts that reversible error resulted from the prosecuting attorney's misuse of photographic exhibits of the spot where the body lay after the shooting when the prosecutor was making his closing argument to the jury.

Mrs. Evelyn Fosha who lived in the immediate vicinity was the only eyewitness. She testified that upon hearing five shots and someone scream she ran in the direction from which the sounds came and stopped at a point several hundred feet from where the shooting occurred. Her testimony in part reads:

"I saw what appeared to be one person lying on the ground and I yelled 'Get up or I will shoot' and the figure on top raised up so that I could clearly tell it was a woman. She got just part way up and glanced toward me but was looking more at the woman on the ground and at that time she gave her a couple of slaps or hits and she seemed to be striking the head and shoulders with a side like motion. I yelled for her to stop but she did not. I can't tell how many times she struck her.. I yelled 'for God's sake stop' and she got up and walked around the body of the woman lying on the ground and she kicked the body once, the right leg raised up off the ground, then she kicked it a second time, * * * She then kicked the body down the hill and *I saw it roll for a distance of 6 to 10 feet.* * * * She then followed the body down the hill and proceeded to

beat the body again. * * * There was some object in her hand when she beat but I could not determine what it was. I then ran back * * * I went over to Mrs. Richard's home. When I came back where I had been standing, there was one woman still lying in the same position as I had left her, and the other had left.''

This witness further testified that about 50 minutes later she went with Dr. Robb to the body and at that time the body was in the same place as where she left it after first observing defendant and Mrs. Cummings.

Mr. Harry Agge, chief of police of Belleville, another witness for the prosecution, was notified of the shooting. He went immediately to the scene and was the first person there. He testified:

''There was a spot as if a struggle had taken place. In this area the snow was packed down and you could only see foot prints 'now and then.' This would be about 8 feet wide and 15 feet long. The body was 11 or 12 feet from this 8 by 15 struggling area in a northwesterly direction towards the bottom of the hill. * * * The path that led up the side of this hill towards this 8 by 15 area was not very wide and the 10 feet of this path between the body and the start of the struggling area you could not distinguish that they had been walking Indian file as you could in other parts of the path before that point. *The path in this 10 foot would be about 18 inches.* * * * The only marks with the exception of blood spots, between the body and the bottom part of the struggling area were these in the 10-foot path. * * *

''Q. Did you see a mark near the body that appeared as though the body had hit the snow and rolled over?

''A. Yes, sir. * * * Well, it looked as though something, the body had fallen and rolled maybe a quarter turn.''

It is apparent from the above-quoted record that there was some conflict between the testimony of Mrs. Fosha as to the body being kicked by defendant and that it rolled to the spot where it was found and the assault there renewed, and the testimony given by Mr. Agge that between the struggle area and the place where the body was found there was only a narrow path through the snow and no evidence about the body of the renewed assault. This discrepancy was strenuously urged by defendant's counsel as bearing upon the dependability of the testimony of Mrs. Fosha. When the prosecuting attorney in his final argument sought to meet this contention of defendant's counsel he referred specifically to photographic exhibits 41 and 47, particularly challenging the attention of the jury to these photographs. Each of these photographs is of the area immediately surrounding the point where the body lay and each of them conspicuously discloses that the snow in that area was trampled down very decidedly; but the undisputed fact is that these photographs were taken the day following the shooting and in the interim large numbers of people had visited the spot. In his effort to avoid the jury's being misled by such use of these photographs taken after the condition was admittedly materially changed, defendant's counsel sought repeatedly to interpose an objection and get the above-noted facts before the jury. In his effort to do this, defendant's counsel was wholly prevented by counter objections and colloquy upon the part of the prosecuting attorney and finally by the ruling of the trial court which amounted to no more than saying that the exhibits were already in evidence and the jury were advised when and by whom the photographs were taken and they would be considered. In his

charge to the jury the trial court did not in any
way clear this phase of the record.  In the particu-
lar above noted we think the prosecuting attorney
was decidedly unfair and that his conduct together
with the indefinite ruling of the trial court resulted
in a prejudicial presentation of the case to the jury;
and this as to a very material point because it had
a decided bearing upon the degree of dependability
the jury would be justified in placing upon the testi-
mony of the only eyewitness, Mrs. Fosha.  The
prosecuting attorney's misuse of these two exhibits
tended strongly to corroborate Mrs. Fosha's testi-
mony, whereas the record discloses that correspond-
ing photographs portraying the true condition fol-
lowing the shooting would have conflicted to some
degree with the testimony of this witness.  If the
prosecuting attorney had been disposed to be fair,
as was his duty to be, he should not have only been
willing but anxious that the jury should understand
that the condition surrounding the point where the
body lay as disclosed by exhibits 41 and 47 was not
a portrayal of the condition immediately following
the shooting.  We think such a course of conduct
cannot be tolerated and is not consistent with the
right of a fair trial to which every accused person
is entitled.

Appellant complains that the prosecuting attor-
ney, on cross-examination of defendant, displayed
before the jury a gun which was in no way connected
with the crime charged and cross-examined defend-
ant with reference to this weapon.  Later, at the
request of the prosecuting attorney, this was all
stricken from the record.  Doubtless the incident
would not recur on retrial, and in any event in the
absence of a showing of bad faith it would hardly
be held to constitute reversible error.

Numerous other assignments of error are urged in appellant's brief; but our review of the record brings the conclusion that these claimed errors are either such that there would be little probability of their reoccurrence on retrial or they are not prejudicial to the extent of justifying reversal.

In asserting that on this record appellant should be discharged from custody, her counsel state their position as follows: "Every fact and circumstance presented one question for the jury to decide, *i. e.*, Was the defendant guilty of first degree murder, or was she not guilty?" Our review of this record discloses there is ample testimony to sustain a verdict of manslaughter and for this reason we are not in accord with appellant's contention just above noted.

For the reasons hereinbefore indicated the judgment entered in the circuit court should be set aside and a new trial ordered.

Sharpe, and Wiest, JJ., concurred with North, J.