*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

UNPUBLISHED
March 23, 2023

v

THOMAS PAUL SUDZ,

Defendant-Appellant.

No. 359298
Oakland Circuit Court
LC No. 2019-271777-FC

Before: CAVANAGH, P.J., and MARKEY and BORRELLO, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial conviction of first-degree premeditated murder, MCL 750.316(1)(a), for which he was sentenced to life imprisonment without parole. The principal issue in this case is whether an automatism defense is barred by our Supreme Court's interpretation of the insanity defense statutes in *People v Carpenter*, 464 Mich 223; 627 NW2d 276 (2001). But even if it is not barred, defendant has not established entitlement to appellate relief and we, therefore, affirm.

## I. BACKGROUND

This matter arises from the murder of defendant's wife, Beth Alsup Sudz. The evidence at trial indicated that Beth was having an affair before her death and may have been making arrangements to leave defendant. Defendant became severely depressed upon learning of the affair in the fall of 2018. On February 5, 2019, defendant's primary care physician prescribed sertraline—a serotonin selective reuptake inhibitor (SSRI) antidepressant—an additional non-SSRI antidepressant (trazadone), and an anxiety sedative (temazepam). Approximately three weeks later, defendant was involuntarily hospitalized for psychiatric treatment on February 24, 2019. He complained about the side effects he was experiencing during his hospitalization, prompting the attending physician to prescribe a second non-SSRI antidepressant (mirtazapine) in lieu of the sertraline. Defendant was discharged on February 28, 2019. At the time of Beth's murder, however, defendant had purportedly stopped taking the antidepressants.

The police conducted a welfare check at Beth's and defendant's home on March 17, 2019. Beth was discovered dead in their bed, with obvious signs of severe head trauma. She had been

stabbed at least 20 times with such force that the wounds crushed and fractured portions of her skull. Beth also sustained classic defensive injuries, namely, a number of stab wounds, superficial cuts, and contusions on her arms and hands. Defendant was found on the floor of the bedroom, unconscious from an apparent overdose of prescription medications. A urinalysis conducted at the hospital reflected benzodiazepines and ecstasy in defendant's system, though defendant denied using illegal drugs, and a defense expert indicated that a metabolite of one of defendant's prescribed medications could be mistaken for ecstasy in a urine screen. In the bathroom adjoining the master bedroom, the police discovered several medication bottles, a clean butcher knife, and a handwritten note that said: "She drove my crazy with all her affairs. Thank you, Patrick Higgins, Alan Ducker, and others."[1] Additionally, blood-stained clothing was found wrapped in a blood-stained towel on the laundry machine in the basement.

Defendant was later examined by several medical or mental health professionals, during which he recounted the events leading up to Beth's death with varying levels of detail. Defendant recalled attending a hockey game with his son during the day on March 16, 2019, and taking two "sleeping pills" later in the evening. Defendant also remembered standing on Beth's side of the bed with a hammer.[2] The next thing he remembered was waking up, seeing blood everywhere, and taking a bunch of pills in order to end his life.

Defendant presented an insanity defense at trial, supported by several experts. Dr. Randall Commissaris, an expert in pharmacology and toxicology, testified regarding the manner in which defendant's various medications could have affected his behavior, focusing primarily on sertraline. Dr. Commissaris cited a 2020 Swedish study that found SSRI antidepressants could cause a slight increase in aggression and violence and that those effects could persist up to three months after discontinuing the medication. He suggested that the extremely violent nature of the murder, coupled with defendant's longstanding nonviolent history, could be reflective of a person experiencing a rare, severe, and adverse effect of a recently discontinued SSRI antidepressant, especially if those effects were exacerbated by ecstasy. Additionally, defendant's ingestion of temazepam that night would increase the likelihood of retrograde amnesia.

Forensic psychiatry expert Dr. Gerald Shiener noted that defendant was diagnosed with major depression during his February 2019 hospitalization. Dr. Shiener believed that defendant's depression persisted in the weeks following his discharge and was complicated by mild brain atrophy. Dr. Shiener opined that defendant's depression constituted a mental illness that "impaired his ability to appreciate the consequences of his actions, conform them to that effect expected by the law, and to really determine whether he was acting properly or improperly, whether he knew right from wrong." Like Dr. Commissaris, Dr. Shiener reasoned that the sudden emergence of violence so late in defendant's life suggested external factors were at play, including medications, mental illness, and brain disease. An expert in forensic psychology likewise opined that defendant had a mental illness at the time of the crime, marked by impaired judgment, difficulty with rational

---

[1] The note also instructed Beth's daughter to take the family cat.

[2] There was no evidence that a hammer was used in the murder.

thinking, and an inability to focus, and that defendant's mental illness left him unable to conform his conduct to the requirements of the law.

Unpersuaded by the defense's insanity theory, the jury found defendant guilty of first-degree premeditated murder. This appeal followed.

## II. AUTOMATISM DEFENSE

On appeal, defendant first argues that the jury should have been instructed regarding the defense of automatism or, alternatively, that he was denied the effective assistance of counsel when his attorneys failed to request the instruction. The prosecution contends that Michigan does not recognize an automatism defense, and, even if the defense were available in this state, the evidence did not support it.

Defendant did not request an automatism instruction at trial, so his claim of instructional error is unpreserved. See *People v Everett*, 318 Mich App 511, 526; 899 NW2d 94 (2017). More importantly, after the jury received its instructions, the court inquired whether the parties had any objections, and defendant's attorneys both responded in the negative, thereby waiving direct review of this issue. "Waiver has been defined as the intentional relinquishment or abandonment of a known right." *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000) (quotation marks and citation omitted). Unlike forfeiture by failure to assert a right in a timely manner, waiver extinguishes any error and precludes appellate review. *Id.* By expressing satisfaction with the instructions provided, counsel waived review of defendant's claim of instructional error. See *id.* at 215, 219. Even so, a waived issue might still support appellate relief if defendant can establish a valid claim of ineffective assistance of counsel. See *People v Traver*, 502 Mich 23, 43 n 10; 917 NW2d 260 (2018).

"The question whether defense counsel performed ineffectively is a mixed question of law and fact; this Court reviews for clear error the trial court's findings of fact and reviews de novo questions of constitutional law." *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012). In the absence of an evidentiary hearing, this Court's review of ineffective assistance claims is limited to mistakes apparent from the existing record. *People v Muhammad*, 326 Mich App 40, 63; 931 NW2d 20 (2018).

Ineffective assistance claims are generally governed by the two-part test articulated in *Strickland v Washington*, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984). *People v Leffew*, 508 Mich 625, 637; 975 NW2d 896 (2022).

> First, the defendant must establish that counsel's performance was deficient. In evaluating deficient performance we consider "whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." Second, the error must have prejudiced the defendant. To establish prejudice, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Reasonable probability means "a probability sufficient to undermine confidence in the outcome." [*Id.* (citations omitted).]

Defendant directs our attention to a plethora of authority from other jurisdictions that recognize automatism as a defense negating the actus reus of an offense, the mens rea of an offense, or both, but acknowledges that there is no binding precedent recognizing the defense in this state. He also acknowledges that the United States Court of Appeals for the Sixth Circuit has reached the contrary conclusion, citing *Carpenter*, 464 Mich 223, for the notion that an automatism defense must be raised within the statutory framework of an insanity defense. *Haskell v Berghuis*, 511 Fed Appx 538, 545 (CA 6, 2013).[3] Because trial counsel cannot be faulted for failing to advance a meritless position, when there is a question as to whether a defendant can assert a particular affirmative defense, the availability of that defense should be addressed first. *Leffew*, 508 Mich at 638.

An automatism defense, also referred to as unconsciousness, dictates that "one who engages in what would otherwise be criminal conduct is not guilty of a crime if he does so in a state of unconsciousness or semi-consciousness." 2 LaFave, Substantive Criminal Law (3d ed), § 9.4, p 39. According to LaFave, "Although this [defense] is sometimes explained on the ground that such a person could not have the requisite mental state for commission of the crime, the better rationale is that the individual has not engaged in a voluntary act." *Id*. See also *City of Missoula v Paffhausen*, 367 Mont 80, 89; 289 P3d 141 (2012) ("Automatism refers to behavior performed in a state of unconsciousness or semi-consciousness such that the behavior cannot be deemed volitional."). Our review of caselaw addressing automatism or unconsciousness suggests that the more common trend in recent years is consistent with LaFave's approach, in that many jurisdictions recognizing the defense seem to view automatistic or unconscious acts as involuntary, thus negating the actus reus element.[4] See, e.g., *Gonzalez v State*, 616 SW3d 585 (Tex Crim App, 2020) (discussing statutory provision requiring criminal act to be undertaken voluntarily, such that behavior triggered by reflex, convulsion, unconsciousness, or other nonvolitional impetus cannot support criminal conviction); *People v Johnson*, 2018 IL App (1st) 140725; 105 NE3d 860 (2018) (explaining that because a voluntary act is a material element of every offense, one who engages in conduct "in a state of automatism, who lacks the volition to control or prevent his conduct, cannot be criminally responsible for such involuntary acts"); *Wagner v State*, 390 P3d 1179, 1182 (Alas App, 2017) (reasoning that a voluntary act is an implicit element of all criminal offenses, and "[t]he criminal law's concept of involuntariness includes instances where a defendant is rendered unconscious by conditions or circumstances beyond the defendant's control, if the defendant neither knew nor had reason to anticipate this result"); *United States v Torres*, 74 MJ

---

[3] *Haskell* is both unpublished and decided by a federal court of appeals and, therefore, not binding on this Court. *Bartlett Investments Inc v Certain Underwriters at Lloyd's London*, 319 Mich App 54, 60 n 2; 899 NW2d 761 (2017).

[4] Other jurisdictions treat automatism as precluding both the actus resus and mens rea of the offense. See, e.g., *State v King*, 281 NC App 587, 595; 868 SE2d 913 (2022) ("Automatism, or unconsciousness, is a complete defense to a criminal charge . . . because [t]he absence of consciousness not only precludes the existence of any specific mental state, but also excludes the possibility of a voluntary act without which there can be no criminal liability.") (quotation marks and citation omitted; alteration in original); *Hale v State*, 191 So3d 719, 725 (Miss, 2016) ("A successful automatism defense negates the requisite intent for a criminal offense, but it also eliminates the voluntariness of the criminal act.").

154 (2015) ("In cases where the issue of automatism has been reasonably raised by the evidence, a military judge should instruct the panel that automatism may serve to negate the actus reus of a criminal offense."); *State v Hinkle*, 200 W Va 280, 286; 489 SE2d 257 (1996) (opining that an unconsciousness or automatism defense is distinct from legal insanity, in that the former negates the voluntariness of the act, rather than any mental component of the crime).

With that background in mind, we tend to agree with defendant that *Carpenter* should not be construed as necessarily precluding an automatism defense. The *Carpenter* Court held that the Legislature's enactment of a comprehensive statutory scheme governing defenses based on mental illness signaled its intent to preclude "evidence of mental abnormalities short of legal insanity to avoid or reduce criminal responsibility by negating specific intent." *Carpenter*, 464 Mich at 226. Under MCL 768.21a(1), a defendant may assert an affirmative defense of legal insanity if, as a result of mental illness or intellectual disability, the defendant "lacks substantial capacity either to appreciate the nature and quality or the wrongfulness of his or her conduct or to conform his or her conduct to the requirements of the law."[5] MCL 768.21a(1). On the other hand, mental illness or intellectual disability "does not otherwise constitute a defense of legal insanity." *Id*. To the extent a factfinder determines that the defendant is mentally ill, but has not otherwise established legal insanity—that is, the defendant did not demonstrate by a preponderance of the evidence "that he or she lacked the substantial capacity either to appreciate the nature and quality or wrongfulness of his or her conduct or to conform his or her conduct to the requirements of the law,"—the defendant may be found "guilty but mentally ill." MCL 768.36(1)(c). Under such circumstances, the defendant remains subject to punishment as any other defendant, though arrangements for appropriate treatment are required. *Carpenter*, 464 Mich at 232. The Legislature also adopted a number of procedural requirements applicable to cases involving an insanity defense. *Id*. at 231.

The defendant in *Carpenter* pursued a diminished capacity defense, which "allows a defendant, even though legally sane, to offer evidence of some mental abnormality to negate the specific intent required to commit a particular crime." *Id*. at 232. The Court concluded that the foregoing statutory scheme "conclusively determined when mental incapacity can serve as a basis for relieving one from criminal responsibility," effectively creating an "all or nothing insanity defense." *Id*. at 237. It further explained:

> Central to our holding is the fact that the Legislature has already contemplated and addressed situations involving persons who are mentally ill . . . yet not legally insane. As noted above, such a person may be found "guilty but mentally ill" and must be sentenced in the same manner as any other defendant committing the same offense and subject to psychiatric evaluation and treatment. MCL 768.36(3). Through this statutory provision, the Legislature has demonstrated its policy choice that evidence of mental incapacity short of insanity cannot be used to avoid or reduce criminal responsibility *by negating specific intent*. [*Id*. (emphasis added).]

---

[5] *Carpenter* construed the former version of the statute as it existed before it was amended by 2014 PA 76. Other than replacing the phrase "mentally retarded" with "intellectual disability," the amendment did make any substantive alterations to the relevant language.

The Supreme Court's rejection of the diminished capacity defense clearly focused on the intent element, i.e., mens rea, while the modern trend is to treat automatism as negating the actus reus of the offense. In light of this distinction, it appears that *Carpenter* does not necessarily preclude an automatism defense as a means of negating the actus reus.

We acknowledge that most of the authority cited above regrading automatism or unconsciousness comes from jurisdictions with statutory provisions requiring a voluntary act or omission as the basis for criminal liability, and it does not appear that Michigan has a comparable legislative enactment. See, e.g., Tex Penal Code Ann 6.01 (West) ("A person commits an offense only if he voluntarily engages in conduct, including an act, an omission, or possession."); 720 Ill Comp Stat Ann 5/4-1 (West) ("A material element of every offense is a voluntary act, which includes an omission to perform a duty which the law imposes on the offender and which he is physically capable of performing."); Alaska Stat Ann 11.81.900 (West) (defining "voluntary act" as "a bodily movement performed consciously as a result of effort and determination . . ."); Mont Code Ann 45-2-202 (West) (requiring a voluntary act as a material element of every offense). Nonetheless, permitting automatism as a defense negating the actus reus seems consistent with common-law principles already recognized in Michigan.

"[A]t common law, a defendant could *admit* that he committed the act, but defend on the basis that the act was committed involuntarily." *People v Likine*, 492 Mich 367, 393; 823 NW2d 50 (2012). That is, if the conduct at issue was a reflexive action, spasm, seizure, convulsion, or "bodily movement occurring while the actor is unconscious or asleep," the involuntariness of the act provided a defense against the actus reus. *Id*. at 393-394. "The common thread through these 'involuntariness' defenses is that the act does not occur under the defendant's control, and thus the defendant was powerless to prevent its occurrence and cannot be held criminally liable for the act." *Id*. at 394. While not termed "automatism," the common law clearly precluded criminal convictions premised on automatistic behaviors. And this Court must presume traditional common-law defenses remain available absent a clear legislative intent to the contrary. *People v Dupree*, 486 Mich 693, 706; 788 NW2d 399 (2010). We are bound by *Carpenter*'s conclusion that the insanity defense is the sole method of avoiding criminal responsibility on the basis of mental illness, *Carpenter*, 464 Mich at 239, but an automatism defense turns on the voluntariness of the underlying conduct—not the existence and implications of a mental illness. Indeed, automatism defenses have been raised in instances in which there was no mental illness typically required for an insanity defense. See LaFave, § 9.4(b), pp 41-42 (indicating that some courts have permitted automatism defenses on the basis of epilepsy, stroke, sleepwalking, sleep deprivation, hypnotism, involuntary intoxication, physical trauma, or emotional trauma).

The theoretic availability of an automatism defense in Michigan does not, however, help defendant in this case. "A criminal defendant is entitled to have a properly instructed jury consider the evidence against him." *Everett*, 318 Mich App at 527 (quotation marks and citation omitted). To that end, "[a] defendant's request for a jury instruction on a theory or defense must be granted if supported by the evidence." *People v McKinney*, 258 Mich App 157, 163; 670 NW2d 254 (2003). Contrary to defendant's assertions on appeal, the evidence introduced at trial simply did not support an instruction regarding automatism.

The prosecution's forensic psychology expert, Dr. Elizabeth Toplyn, did not believe that defendant's depression constituted a mental illness for purposes of an insanity defense. She further

reasoned that defendant's goal-directed behavior around the time of Beth's murder suggested that he understood the nature and wrongfulness of what he did. To rebut Dr. Toplyn's opinion on this point, the defense elicited testimony from Dr. Shiener to the effect that the motivations Dr. Toplyn assigned to defendant's purportedly goal-directed behavior were speculative when defendant was unable to recall that behavior. Dr. Shiener's testimony continued with the following exchange:

> *A.* Depressed people have disorganized thinking. People with brain atrophy have disorganized thinking. People who take two sleeping pills have disorganized thinking, and sleeping pills are known and reported for being what we call amnestic agents. They impair the recollection for the period you're under the influence of that medicine.

> The [Food and Drug Administration] warning for temazepam . . . describes that people engage in complex behavior while under the influence of these medicines without having any recollection afterwards.

> *Q.* For instance, you have probably in your own practice lots of reports about people driving under the influence and not remembering, making meals and eating and not remembering, correct?

> *A.* Sleeping pills are known for and are described by the Food and Drug Administration and their monographs as being capable of causing sleep eating, sleep driving, sleepwalking, and those are—we call them automatisms because while people are partially sedated, they're able to engage in automatic behaviors. And automatic behavior would be you walk up to a door and you know to push it or if the door has a doorknob, you know to grab the doorknob, but you can't make conscious decisions. You can't make rational decisions during that period, and the actions tend to be more aimless.

The most that can be said of Dr. Shiener's testimony regarding automatistic behavior is that some of defendant's conduct *after* Beth's death—for instance, cleaning the knife or removing his blood-stained clothes—were involuntary as a result of the sleeping pills he consumed that night. Defendant did not present any evidence suggesting that violently stabbing his wife at least 20 times was the type of overlearned, reflexive behavior that a person could engage in without conscious volition. In the absence of such evidence, an instruction regarding automatism would not be warranted, and defendant's trial attorneys were not ineffective for failing to request it. See *Leffew*, 508 Mich at 638 ("Defense counsel is not ineffective for failing to advance a meritless or frivolous argument."); *McKinney*, 258 Mich App at 163-164 (explaining that a request for instruction regarding a defense must be supported by evidence).

## III. REBUTTAL WITNESS NOTICE

Defendant also argues that the trial court erred by allowing the prosecution to belatedly amend its witness list to add rebuttal witnesses. We disagree.

We review a trial court's decision to allow the prosecution to add witnesses for an abuse of discretion, which occurs when the decision "falls outside the range of reasonable and principled

outcomes," or when the trial court makes an error of law. *Everett*, 318 Mich App at 516 (quotation marks and citation omitted).

Under MCL 767.40a(3), the prosecution must provide the defendant with a list of witnesses the prosecution intends to call at trial not less than 30 days before trial. Additionally, the prosecution is permitted to add or delete witnesses "at any time upon leave of the court and for good cause shown or by stipulation of the parties." MCL 767.40a(4). In its pretrial order, the trial court stated that the parties could amend their witness lists without leave no later than 28 days before trial. The prosecution filed an amended witness list on July 29, 2021, in accordance with both MCL 767.40a(3) and the trial court's pretrial order. Then, less than two weeks before trial, the prosecution filed a notice of intent to rebut defendant's insanity defense, identifying several potential rebuttal witnesses, including Dr. Toplyn, Dr. Robert Lacoste, Dr. Sushma Gunturu, and Paula Goodman, a social worker at the Oakland County jail.

Defendant moved to strike these witnesses on the basis that they were not identified in accordance with the trial court's pretrial order. The prosecution opposed the motion, arguing that the trial court's pretrial order simply mirrored MCR 6.201 and did not address rebuttal witnesses in cases involving the insanity defense. The prosecution asserted that such rebuttal witnesses were governed by MCL 768.20a(7), which provides:

> Within 10 days after the receipt of the report from the center for forensic psychiatry or from the qualified personnel, or within 10 days after the receipt of the report of an independent examiner secured by the prosecution, whichever occurs later, but not later than 5 days before the trial of the case, or at another time the court directs, the prosecuting attorney shall file and serve upon the defendant a notice of rebuttal of the defense of insanity which shall contain the names of the witnesses whom the prosecuting attorney proposes to call in rebuttal.

The prosecution reasoned that its notice was not untimely under this provision. It further noted that each of its newly named witnesses were known to the defense and would not result in unfair surprise.

The trial court denied defendant's motion for three independent reasons First, the court opined that its generic pretrial order was not intended to override statutory provisions specifically applicable to cases involving the insanity defense. Second, even if its order overrode the procedural requirements of the relevant statutes, the order also called for modification of the witness list for good cause, and the existence of the statutory scheme governing insanity defense procedures constituted good cause. Lastly, each of the new witnesses was known to defendant, and he did not allege that he was surprised or prejudiced by their late addition. The trial court did not abuse its discretion by permitting the prosecution to call the witnesses identified in its August 18, 2021 notice.

As noted by the trial court, the pretrial order permitted modification of its requirements upon a showing of good cause. MCL 767.40a(4) likewise allows addition or deletion of witnesses by the prosecution with the court's leave for good cause. The prosecution did not seek leave to amend its witness list before filing notice of its intended rebuttal witnesses, apparently because it did not believe leave was necessary in light of its compliance with MCL 768.20a(7). The

-8-

prosecution's position was well-reasoned, as the "canons of statutory construction recognize the principle that when a specific statutory provision differs from a general one, the specific one controls." *People v Meeks*, 293 Mich 115, 118; 808 NW2d 825 (2011). Here, while both MCL 768.20a and MCL 767.40a include provisions regarding the prosecution's disclosure of trial witnesses, MCL 768.20a is clearly the more specific of the two in that it addresses the procedural requirements applicable only to insanity defense cases. Whether the prosecution's notice of rebuttal witnesses was filed within 10 days of receiving the report from the center for forensic psychiatry or another independent examiner is unclear from the record, but the notice was clearly filed well in advance of the five-day deadline dictated by MCL 768.20a(7), and defendant conceded below that the notice was apparently in compliance with that statute.

The trial court's consideration of the lack of surprise to defendant is also persuasive. The purpose of requiring the prosecution to provide advance notice of its witnesses is to prevent surprise at trial. See, e.g., *People v Herndon*, 246 Mich App 371, 402-403; 633 NW2d 376 (2001) (holding that the trial court did not abuse its discretion by allowing the prosecution to call a witness not previously endorsed as a trial witness when the content of the testimony was not a surprise); *People v Jurkiewicz*, 112 Mich App 415, 419; 316 NW2d 440 (1982)[6] (discussing purpose of MCL 768.20a and reversing conviction when prosecution called rebuttal witness without *any* notice). The prosecution's rebuttal witnesses were clearly known to defendant, and their testimonies could not have come as a surprise. Dr. Lacoste treated defendant during his psychiatric hospitalization the month before Beth's death. The defense was clearly well versed in the details of Dr. Lacoste's treatment, as defendant relied heavily on the circumstances surrounding that hospitalization as evidence that he had a mental illness at the time of Beth's death. Dr. Gunturu consulted defendant following his overdose. As the first psychiatric professional to treat defendant after the murder, her testimony should have been anticipated in response to defendant's insanity defense. Goodman, who assessed defendant for suicide watch upon his transfer from the hospital to Oakland County jail, was likewise one of the early professionals to interact with defendant. Dr. Toplyn evaluated defendant at the center for forensic psychiatry pursuant to MCL 768.20a(2), making it all but certain that she would be the prosecution's primary rebuttal witness. Considering the prosecution's compliance with MCL 768.20a(7) and the lack of surprise to defendant, the trial court did not abuse its discretion by allowing the prosecution to call the rebuttal witnesses identified in its August 18, 2021 notice.

Affirmed.

/s/ Mark J. Cavanagh
/s/ Jane E. Markey
/s/ Stephen L. Borrello

---

[6] Opinions of this Court issued before November 1, 1990 are not binding under MCR 7.215(J)(1), but are "entitled to deference under traditional principles of stare decisis and should not be lightly disregarded." *People v Haynes*, 338 Mich App 392, 414 n 1; 980 NW2d 66 (2021).