**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 13a0073n.06

No. 10-1432

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
*Jan 16, 2013*
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| CRAIG HASKELL, | ) | |
| | ) | |
| **Plaintiff-Appellant,** | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| MARY BERGHUIS, Warden, | ) | |
| | ) | |
| **Defendant-Appellee.** | ) | **O P I N I O N** |
| _____ | ) | |

**BEFORE: MERRITT and MOORE, Circuit Judges; and MAYS, District Judge.**[*]

**MAYS, District Judge.** Petitioner Craig Haskell ("Haskell") seeks review of the denial of

his Petition for Writ of Habeas Corpus. Haskell was convicted on August 15, 2003, by a jury in

Livingston County, Michigan, which returned a verdict of "guilty but mentally ill" on four counts

of first-degree criminal sexual conduct ("CSC"), one count of second-degree CSC, and aggravated

domestic violence against Rae Russell ("Russell"), Haskell's ex-girlfriend. The state trial court

sentenced Haskell to concurrent prison terms of 12-30 years for first-degree CSC, 10-15 years for

second-degree CSC, and one year in Livingston County jail for aggravated domestic violence.

Haskell has exhausted his state habeas procedures. In *Haskell v. Berghuis*, 695 F. Supp. 2d 574, 600

(E.D. Mich. 2010), the district court denied Haskell's federal habeas petition, but granted a

certificate of appealability ("COA") on: (1) whether Haskell had a Due Process right to present an

_____

[*]The Honorable Samuel H. Mays, Jr., United States District Judge for the Western District
of Tennessee, sitting by designation.

automatism defense; and (2) whether his attorneys' representation was ineffective in violation of the Sixth Amendment. In addition to the issues certified, Haskell seeks review of the state trial judge's finding that four separate digital and/or penile penetrations constituted continuing criminal behavior. We AFFIRM the district court's denial of Haskell's habeas corpus petition.

## I. BACKGROUND

### A. The Night of May 17, 2002

Haskell and Russell dated for more than two years in high school, but separated during Russell's first semester at Grand Valley State University. On May 13, 2002, Haskell, then 21 years old, visited Russell for the first time since their relationship had ended. Each had recently returned home for summer vacation, and they had agreed to spend time together as friends. Russell, then 19, testified that Haskell was sullen and depressed because of problems at college and that he was suicidal. During this visit, Haskell sought reconciliation, despite Russell's understanding that their relationship was platonic. When Haskell refused to leave after several hours together, Russell succumbed to the pressure of the situation and engaged in oral sex with him.

Despite the awkwardness of the May 13 encounter, Haskell and Russell agreed to watch a movie at Russell's house on Thursday, May 17. Haskell behaved normally when he arrived, but after they went downstairs to watch a movie, Haskell became upset when Russell sat on a different couch. Haskell's seemingly innocent questions about why Russell refused to sit next to him became more serious, and he began making threats and demanding to know why they could not get back together. Russell believed that his behavior was an attempt to bring her closer to him.

2

Russell asked Haskell to leave, but he refused. Eventually, he agreed to leave if Russell changed into her pajamas, which included a t-shirt, athletic shorts, panties, and bra. Russell understood his request as a desire to tuck her into bed before leaving. After Russell had finished changing, Haskell sat next to her on the bed. He began speaking about his unhappiness, eventually concluding that he had made a final decision. When Russell asked about that decision, Haskell punched her in the left eye with enough force to propel her into a nearby nightstand. Russell testified that Haskell continued to strike her.

While pinning Russell to the ground, Haskell said that he had asked her to change into her pajamas to make it easier for him to rape her before he committed suicide. Haskell removed Russell's clothing and molested her vagina and breasts, digitally penetrating her vagina on at least two separate occasions. He vaginally raped her. After intercourse, Haskell instructed Russell to lie on the bed. He grabbed a pair of scissors from Russell's nightstand, and Russell thought he intended to kill her.

Haskell's demeanor changed abruptly. He lowered the scissors, covered Russell with a blanket, and repeatedly apologized for his actions. His apologies appeared to indicate confusion about what he had done. Relieved, Russell told him to leave her house and seek help. Before leaving, Haskell requested time before Russell told her parents.

Russell's initial police report included only Haskell's physical assault.[1]  When asked by attending physicians at the local hospital where she was treated, she denied having experienced any sexual assault or advances.  After the family had returned from the hospital, Russell's mother discovered blood in Russell's underwear and confronted her about a possible sexual encounter.  Russell admitted that Haskell had raped her, and her parents took her back to the hospital, where doctors conducted a "rape kit" and a physical exam.  The examinations showed no signs of sexual trauma to the vagina or anus, and there was no evidence of forceful sexual contact.  Russell filled out a new police report at the hospital that detailed the sexual assault.

While Russell was being treated for her injuries, Haskell returned to his parent's house.  He appeared frantic, confused, and allegedly heard voices in his head.  He did not remember the identity of the person he had just assaulted but eventually identified Russell as the victim.  Haskell's parents had him admitted to a psychiatric hospital at the University of Michigan, where he stayed for approximately ten days.  Haskell was under the care of Dr. Kenneth Pitts, whose tentative diagnosis of Haskell was NOS, or "not otherwise specified."

---

[1]Russell's original statement to the police reads:  "Craig and I went out for two years and eight months.  We broke up in October, 2001.  I didn't see him until May of 2002.  At this time we were arguing 'cause he wanted to date again and I did not.  He had been having some school and family problems and needed to talk them out with me. . . . [W]hen I couldn't help him and didn't want him back he hit me four or five times in the head.  Then he muffled my screams then he felt bad and I told him to leave and he left out the front door."

**B. Ronald Plunkett and Barry Resnick**

After Haskell was arrested, he retained Ronald Plunkett ("Plunkett") as his attorney. On the day before his trial, Haskell sought to have Plunkett removed as his counsel. Among other things, Haskell said that Plunkett had failed to communicate the terms of a pending plea bargain until immediately before trial. The trial court granted Haskell's request for new counsel, revoked his bond, and held him in custody until trial. Haskell then hired Barry Resnick ("Resnick"), and the court granted a two-month continuance so Resnick could prepare for trial.

Before being replaced, Plunkett had filed a Notice of Intent to Assert the Insanity Defense as required by Michigan law. Resnick also pursued the insanity defense. Resnick offered the testimony of Dr. Pitts, Haskell's attending physician at the University of Michigan, who testified (1) that Haskell's assault on Russell was brought on by a complex partial seizure ("CPS")[2] that left Haskell incapable of appreciating the wrongfulness of his conduct and (2) that Haskell could not conform his conduct to the requirements of the law. The State's expert witness, Dr. Lisa Marquis, evaluated Haskell and agreed that he suffered from a CPS disorder, but disagreed that his disorder prevented him from conforming his behavior to the requirements of the law.

Before trial, Plunkett failed to file a motion under Michigan law that he intended to offer evidence of Russell's past sexual conduct. Resnick also failed to file the motion, although he had

---

[2]CPS involves the temporal lobe of the brain and produces: (1) neuropsychiatric symptoms, (2) visual and olfactory hallucinations, (3) psychotic phenomena after the seizure, (4) rapid heart rate, (5) aggressive acting out, (6) no memory or awareness during the episode or seizure, and (7) no appreciation of any behavior or surroundings during the episode or seizure.

been on the case for more than sixty days before trial. Resnick believed that Michigan law required the motion to be filed within 10 days of arraignment, and he came into the case well after that deadline had passed. The trial court originally prohibited Resnick from asking about Russell's sexual history, but reconsidered its ruling after the State's opening argument placed the former couple's sexual history at issue. Resnick requested, and the trial court granted, permission to ask about Russell's sexual relations with Haskell the Sunday before the events in question. Resnick did not request the opportunity to explore Russell's complete sexual history.

## C. Procedural History

Haskell was convicted on August 15, 2003, by a jury in Livingston County, Michigan, which returned a verdict of "guilty but mentally ill." The state trial court sentenced Haskell, and the Michigan Court of Appeals affirmed his conviction and sentence. *See People v. Haskell*, No. 251929, 2005 Mich. App. LEXIS 1531, at *25 (Mich. Ct. App. June 23, 2005). The Michigan Supreme Court denied leave to appeal the judgment of the Michigan Court of Appeals. *See People v. Haskell*, 712 N.W.2d 448 (Mich. 2006). Haskell timely filed a habeas corpus petition. On February 26, 2010, the district court denied Haskell's petition, but granted a COA on Haskell's Fourteenth and Sixth Amendment claims. *Haskell*, 695 F. Supp. 2d at 600. Haskell timely appealed.

## II. JURISDICTION

We have jurisdiction under 28 U.S.C. § 2253 because the district court issued a COA based on Haskell's "substantial showing of the denial of a constitutional right," and that certificate stated which "specific issues or issues" could be appealed. 28 U.S.C. § 2253(c)(2)-(3). Although the

district court did not issue a COA on Haskell's Due Process claim, we may treat Haskell's notice of

appeal as a request for a COA. *See Johnson v. Hudson*, 421 F. App'x 568, 570 n.1 (6th Cir. 2011).

### III. STANDARD OF REVIEW

We review "de novo a district court's denial of a writ of habeas corpus." *Ramonez v.*

*Berguis*, 490 F.3d 482, 486 (6th Cir. 2007) (citing *Dando v. Yukins*, 461 F.3d 791, 795-96 (6th Cir.

2006)); *see also Nichols v. United States*, 563 F.3d 240, 248 (6th 2009); *Ivory v. Jackson*, 509 F.3d

284, 291 (6th Cir. 2007). "And where as here the district court has reviewed only trial transcripts

and other court records, any factual determinations by the district court are also reviewed de novo."

*Ramonez*, 490 F.3d at 486.

Haskell is entitled to relief if the state court adjudication "(1) resulted in a decision that was

contrary to, or involved an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States; or (2) resulted in a decision that was based

on an unreasonable determination of the facts in light of the evidence presented in the State court

proceeding." Anti-Terrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254(d)(1)-

(2).

Legal principles are "clearly established" if they are "embodied" in a holding of the Supreme

Court. *Thayler v. Haynes*, 130 S. Ct. 1171, 1173 (2010) (citing *Carey v. Musladin*, 549 U.S. 70, 74

(2006)). Decisions are contrary to clearly established Federal law if they are based on legal

conclusions "opposite to [those] reached in Supreme Court precedent." *Ramonez*, 490 F.3d at 486

(citing *Dando*, 461 F.3d at 796). A decision is also contrary to clearly established Federal law "if

the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).

"Unreasonable applications" of clearly established law are distinguishable from incorrect applications. *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002). Federal courts "must find the state court's application of Supreme Court precedent 'objectively unreasonable,' not merely 'incorrect or erroneous.'" *Ramonez*, 490 F.3d at 486 (quoting *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003)). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). A defendant must demonstrate that a state court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Id.* at 786-87. This Court takes the position that, "while the principles of 'clearly established law' are to be determined solely by resort to Supreme Court rulings, the decisions of lower federal courts may be instructive in assessing the reasonableness of a state court's resolution of an issue." *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007) (citation omitted).

## IV. CERTIFIED ISSUES

### A. Haskell's Automatism Defense

Haskell argues that his Due Process rights were violated because Michigan required the presentation of an automatism defense through the framework of its insanity statute. He contends that automatism is fundamentally distinguishable from insanity because it negates key elements of

the criminal charge by "plac[ing] the individual in a state of unconsciousness or semiconsciousness." (Appellant Br. 12-13.) Because Haskell was allegedly unconscious—and therefore unable to control or direct his actions—he argues that he was incapable of forming the actus reus and mens rea of the crimes for which he was charged. (*Id.* at 13.) Haskell argues that placing the burden of proving his defense on him was contrary to and an unreasonable application of clearly established constitutional principles.

It is not obvious that Haskell may bring this Due Process claim. At oral argument the parties were asked to demonstrate that Haskell attempted to raise his automatism defense as anything other than an insanity defense, but was barred by the state trial court from doing so. Haskell directs us to a single passage in the pretrial transcript discussing how the jury will be instructed about shifting burdens of persuasion of Haskell's insanity defense. *See* R. 9-9 (Trial Tr. at 9-10) (Page ID # 1788-89). This passage provides, at best, weak support for the claim that the trial court prevented Haskell from raising his defense in the manner preferred–viz., as a challenge to mens rea and actus reus, rather than as an affirmative defense.

Nevertheless, assuming that Haskell was actually prevented at trial from raising automatism as a defense independent from an insanity defense, he has since properly exhausted his claim. *See Haskell*, 695 F. Supp. 2d at 590 ("Petitioner raised the issue in his supplemental brief on direct appeal as issue 'X', and raised it in his application for leave to appeal to the Michigan Supreme Court as issue 'VI'. . . . The Court will review the issue *de novo*."). In Haskell's supplemental brief to the Michigan Court of Appeals, he "challenge[d] outright [] as violative of the Fourteenth

Amendment's due process clause the actual or apparent requirement of Michigan law that *any* mental-incapacity defense must be presented as an 'insanity' defense." (*See* Def.'s Supp. Br. 49, ECF No. 9-35) (emphasis in original). He relied on "federal cases employing constitutional analysis" and phrased his claim "in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right." *Whiting v. Burt*, 395 F.3d 602, 613 (6th Cir. 2005) (citation omitted). He supported his brief by "facts well within the mainstream of constitutional law" and attached exhibits and articles from medical journals on CPS. *Id.* "This is not an instance where the habeas petitioner failed to 'apprise the state court of his claim.'" *Dye v. Hofbauer*, 546 U.S. 1, 3-4 (2005) (quoting *Duncan v. Henry*, 513 U.S. 364, 366 (1995) (per curiam)). The exhaustion requirement "cannot turn upon whether a state appellate court chooses to [address] in its opinion" a constitutional claim; it must turn on what the party actually argued. *Id.* at 3 (citing *Smith v. Digmon*, 434 U.S. 322, 333 (1978) (per curiam)).

On the merits, the parties dispute the scope of Haskell's Due Process claim. Haskell frames the issue broadly, arguing that his conviction was unconstitutional because "automatism should be recognized as an independent defense apart from the insanity defense." (Appellant Br. 19.) The State narrows the issue, contending that automatism is not a defense clearly established under federal law. (Appellee Br. 15.) According to the State, Due Process does not require that a defendant be permitted to raise whatever defense he chooses, particularly if that defense does not exist as a matter of law. (*Id.*) (citing *Clark v. Arizona*, 548 U.S. 735 (2006)).

Michigan does not recognize an independent automatism defense. Michigan has adopted a "comprehensive statutory framework" outlining when and under what conditions an insanity defense may be argued. *People v. Carpenter*, 627 N.W.2d 276, 277 (Mich. 2001) (discussing Mich. Comp. Laws § 768.21a). In doing so, "the Legislature has demonstrated its policy choice that evidence of mental incapacity short of insanity cannot be used to avoid or reduce criminal responsibility by negating specific intent." *Id.* at 283. Automatism, insofar as it concerns a neurological condition precluding Haskell from forming the requisite intent, is a defense reliant on mental capacity–indeed, Haskell labeled his CPS disorder as a mental-incapacity defense before the state appellate court. Thus, Michigan law requires an automatism defense be raised within the statutory framework of the state's insanity defense; this means, *inter alia,* that Haskell had the burden of proving his defense by a preponderance of the evidence. Mich. Comp. Laws § 768.21a(3).

Supreme Court precedent does not clearly establish an automatism defense, nor does it establish that defendants may raise whatever defenses they choose. *See Clark*, 548 U.S. at 753 (recognizing that defining state crimes is open to state choice); *see also United States v. Sheffer*, 523 U.S. 303, 308 (1998) (stating that lawmakers have "broad latitude" to establish rules for a defendant's presentation of evidence). It is "'within the power of the State to regulate procedures . . . including the burden of producing evidence and the burden of persuasion,' and [the State's] decision in this regard is not subject to proscription . . . unless 'it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Medina v. California*, 505 U.S. 437, 445 (1992) (quoting *Speiser v. Randall*, 357 U.S. 513, 523 (1958)); *see*

11

*also Patterson v. New York*, 432 U.S. 197, 201-202 (1977). Here, Michigan's statute does not shift the burden of proving automatism. Automatism is simply not recognized in Michigan as distinct from an insanity defense. The Supreme Court makes clear that a state's conceptualization of the insanity defense will be accorded broad deference. *See Clark*, 548 U.S. at 752-53. In habeas proceedings, we should be reluctant to "second guess a state court's decision concerning matters of state law." *Greer v. Mitchell*, 264 F.3d 663, 675 (6th Cir. 2001). Given that principle, it would be overreaching to conclude that Haskell's conviction was contrary to clearly established federal law. When "cases give no clear answer to the questions presented," there is no clearly established law. *Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (per curiam).

In the absence of a specific legal rule, it was not unreasonable for Michigan courts to conclude that an automatism defense (sometimes called an unconsciousness defense) is not constitutionally required, or that its presentation outside the context of an insanity defense is not necessary as a matter of due process. To date, few state courts have embraced Haskell's constitutional theory. Haskell states that twelve states recognize a defense of automatism; only five of those states place the burden of proof on the prosecution. Letter Br. at 3 (identifying California, Indiana, South Dakota, Washington, and West Virginia). We have identified only five states that explicitly separate automatism and insanity defenses. *People v. Martin*, 197 P.2d 379, 383 (Cal. 1948); *State v. Caddell*, 215 S.E.2d 348, 363 (N.C. 1975); *Jones v. State*, 648 P.2d 1251, 1258 (Okla. Crim. Ct. App. 1982); *State v. Jenner*, 451 N.W.2d 710, 721 (S.D. 1990); *Fulcher v. State*, 633 P.2d 142, 145-47 (Wyo. 1981). Two of these states require a defendant to prove automatism by a

preponderance of the evidence, as though it were any other affirmative defense. *Caddell*, 215 S.E.2d at 363; *Fulcher*, 633 P.2d at 147. In light of the small minority of states that share Haskell's theory about constitutionally required criminal defenses, it was not an unreasonable application of clearly established federal law for Michigan to require that he present his automatism defense within the framework of an insanity defense.

## B. Ineffective Assistance of Counsel

Haskell claims that he was ineffectively assisted by Plunkett, who represented him from June 2002 to May 2003, and Resnick, who represented him from May 2003 until after his conviction. Haskell identifies several areas of Plunkett's ineffective assistance, but the weight of Haskell's argument is that Plunkett was unprepared. Haskell argues that Resnick was ineffective because he was not knowledgeable about CPS disorder, which was the basis for Haskell's defense.

The law of ineffective assistance is stated in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *See also Padilla v. Kentucky*, 130 S. Ct. 1473 (2010) (ineffective assistance of counsel is a basis for relief under 28 U.S.C. § 2254(d)); *Porter v. McCullum*, 130 S. Ct. 447 (2009). Under *Strickland*, 466 U.S. at 687, Haskell must establish that his counsels' performances were deficient, which requires showing that counsels' errors were so serious they were not functioning as counsel. Haskell must then establish that at least one of the deficient performances prejudiced his defense, meaning that his counsel's errors were so serious that they deprived him of a fair trial or appeal. *Id.* Unless Haskell demonstrates both deficient performance and prejudice, "it cannot be said that the conviction resulted from a breakdown in the adversary process that renders the result unreliable."

13

*Id.* at 687. "Surmounting *Strickland*'s high bar is never an easy task." *Padilla*, 130 S. Ct. at 1485. We must evaluate Haskell's case with "scrupulous care, lest 'intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve.'" *Richter*, 131 S. Ct. at 788 (quoting *Strickland*, 466 U.S. at 689-90).

"The first prong—constitutional deficiency—is necessarily linked to the practice and expectations of the legal community: 'The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" *Padilla*, 130 S. Ct. at 1482 (quoting *Strickland*, 466 U.S. at 688)). The Supreme Court has long "recognized that prevailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable . . . ." *Id.* (citations and internal quotation marks omitted). Although "only guides" and not "inexorable commands," prevailing norms of practice may be "valuable measures . . . of effective representation." *Id.* Claims under this prong carry the strong presumption that "counsel . . . rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Johnson v. Bell*, 525 F.3d 466, 487 (6th Cir. 2008); *see also Strickland*, 466 U.S. at 689.

To establish prejudice, Haskell must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 689. "It is not enough to show that the errors had some conceivable effect on the outcome of the proceeding." *Richter*, 131 S. Ct. 770, 788 (2011) (internal quotation marks omitted). Courts

consider "'the totality of the available [] evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding'"—and gauge it in relation to evidence against the defense. *Id.* at 454 (quoting *Williams*, 529 U.S. at 397-98).

> *Richter* states the inquiry:
>
> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

131 S. Ct. at 788 (internal citations omitted). This inquiry has a "'substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (internal quotation marks omitted). "And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Id.* (citing *Yarborough*, 541 U.S. at 664 ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.")).

### 1. Plunkett

The district court succinctly summarized Haskell's allegations:

(1) Mr. Plunkett and his wife's divorce became final four days after Mr. Plunkett was retained; (2) Mr. Plunkett has admitted to a crack cocaine addiction; (3) Mr. Plunkett was arrested for possession of 25 grams of crack cocaine and is facing incarceration; (4) the Michigan Attorney Grievance Commission was appointed receiver of Mr.

Plunkett's files after the Commission received notice that Mr. Plunkett abandoned his law practice; (5) Mr. Plunkett was under investigation for the death of a 22-year-old woman who was found dead in his apartment from an apparent drug overdose; (6) Mr. Plunkett withdrew as Petitioner's attorney the day before trial was scheduled; (7) Mr. Plunkett requested so many trial date continuances in the past that the trial judge was initially going to allow Petitioner's new attorney Mr. Resnick only three weeks to prepare for trial; (8) Mr. Plunkett told the trial judge that Petitioner threatened him with physical violence, which led to the revocation of Petitioner's bond; (9) Dr. Pitts attested at trial and in an affidavit that Petitioner's incarceration while awaiting trial made it difficult and/or impossible to conduct proper testing in preparation for Petitioner's defense; and (10) Mr. Plunkett's story about being threatened by Petitioner was inconsistent. As to the latter incident, Petitioner argues Mr. Plunkett first told the trial judge that Petitioner threatened him, but at a July 9, 2003 bond hearing, Mr. Plunkett stated that he may have "misinterpreted" what Petitioner had said to him. Petitioner asserts that Mr. Plunkett responded to an attorney grievance by saying that it was Petitioner's father, William Haskell, who had threatened him.[3]

*Haskell*, 695 F. Supp. 2d at 595-96. In his brief, Haskell also identifies Plunkett's failure to address Russell's prior sexual history, which he argues was key impeachment evidence. According to Haskell, Plunkett failed to file a timely notice under Mich. Comp. Laws § 750.520j(2), "even though he knew that [] Russell and Haskell had been in a romantic relationship and the topic came up at the preliminary examination." (Appellant Br. 25.) After reviewing those contentions, the Michigan Court of Appeals concluded that Haskell had failed to show deficient performance, and—even if he had—that the deficient performance had not prejudiced his case. *See Haskell*, 2005 Mich. App. LEXIS, 1531, at *14-18.

---

[3]As the district court noted, most of these issues were revealed after Plunkett no longer represented Haskell. *Haskell*, 695 F. Supp. 2d at 596 n.6.

16

Haskell's ineffective assistance claim does not satisfy the "doubly deferential" habeas standard. *See Knowles*, 556 U.S. at 123. He cites no authority that an attorney's drug or legal problems rise to a level of constitutional concern. Plunkett's personal problems are not relevant to this case absent a showing that they affected his performance. Because Haskell has not made that showing, his argument that Plunkett's personal problems rose to the level of ineffectiveness fails.

The inquiry is whether "there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 131 S. Ct. at 788. Plunkett failed to file notice under Michigan law to cross-examine Russell about her sexual history, but that failure was inconsequential. Haskell's trial counsel sought and received permission to question Russell's sexual history to the limited extent he requested. Even if material, Plunkett's failure to file notice with the court can be seen as a "strategic choice[]." *Strickland*, 466 U.S. at 691. Russell was prepared to testify that she had a prior sexual relationship with Haskell. The inferences from that testimony are obvious. An attorney could reasonably conclude that the benefits of pressing Russell about her prior sexual relationship were outweighed by the danger of alienating the jury, given the physical and emotional injuries Russell had sustained. A "heavy measure of deference to counsel's judgments" is demanded in ineffective-assistance cases. *Id.*

### 2. Resnick

The district court succinctly summarized Resnick's alleged ineffectiveness:

Petitioner argues that Mr. Resnick's ineffectiveness as trial counsel resulted from his lack of knowledge about CPS disorders. Petitioner asserts that Mr. Resnick failed to: (1) object to Dr. Marquis as an expert witness and the admission of her testimony; (2) object to the insanity defense jury instruction; (3) raise the automatism

> defense; and (4) explain to the jury that the totality of Petitioner's actions consisted only of hitting Ms. Russell in the face and stomach during a 15-30 second time period, and did not include a sexual assault.

*Haskell*, 695 F. Supp. 2d at 596-97. Haskell argues that Resnick failed, "perhaps due to lack of preparation time, to fully understand [] CPS disorder," which was likely fatal to Haskell's case. (Appellant Br. 27.) Haskell contends that Resnick's choices were not strategic, but demonstrated a "fundamental misunderstanding of CPS and automatism . . . [and thus] Haskell was unable to establish a defense that shifted the burden of proof from himself to the prosecution." (*Id.*) "Improperly framing this defense" allowed the jury to find that Haskell was "mentally ill" but not "insane." (*Id.*) The Michigan Court of Appeals rejected Haskell's argument in a single paragraph:

> Defendant's claim that he was deprived of effective assistance of counsel because his trial counsel failed to object to the assertions of error addressed on appeal lacks merit because counsel is not required to advocate a meritless position. As noted above, defendant has failed to show any prosecutorial misconduct, instructional error, or improper admission of evidence. Therefore, his trial counsel was not ineffective for failing to object to these assertions of law.

*Haskell*, 2005 Mich. App. LEXIS 1531, at *8.

Haskell was competently represented. He has not identified, and we have not located, a constitutional requirement that Resnick assert a defense not recognized under state law. Resnick's failure to challenge Michigan's insanity defense does not make his representation unsound. It does not demonstrate that he lacked a fundamental understanding of automatism. His line of questioning at trial supports the opposite conclusion. During cross-examination, Resnick asked Russell to describe the rapidity of Haskell's behavior change. He asked, "[D]id [Haskell's behavior] seem like a sudden change or d[id] you notice a gradual change in Craig at, at this time that we're talking

18

about?" (Trial Tr. (Vol. I) 226: 3-6.) When questioning Russell about when Haskell stopped assaulting her, he asked, "Do you recall testifying . . . that: 'Shortly after that, he must have realized what he was doing because he stopped and he covered me with a blanket." (*Id.* 232: 18-23.) He also questioned Russell about what she perceived to be Haskell's "normal" behavior during their previous relationship. (*Id.* 240: 1-16.) Again, Resnick pursued whether Haskell's behavioral change was "drastic" or "gradual." (*Id.* 240: 13-18.) Resnick's questions are consistent with a theory of automatism.

## V. HASKELL'S THIRD ISSUE

Haskell argues that the district court erred in denying a COA on the issue of whether his actions constituted a "continuing pattern of criminal behavior" that supported a 25-point increase under Michigan sentencing law (Appellant Br. 28.) The alleged "continuing pattern of criminal behavior" was the repeated penetration of Russell's vagina by Haskell's fingers and/or penis. The Michigan Court of Appeals rejected this argument, and the district court agreed. See *Haskell*, 2005 Mich. App. LEXIS 1531, at *8; *Haskell*, 695 F. Supp. 2d at 598-99.

Haskell attacks the logic of the state-court decision that "[e]ach forcible penetration of the victim resulted in a separate conviction pursuant to the plain language of the statute and case law." *Haskell*, 2005 Mich. App. LEXIS 1531, at *8. According to Haskell, "[u]nder this theory, almost any crime could, by itself, be deemed a continuing pattern of criminal activity. A person in a fight who landed four punches could be charged with four counts of battery and then that would be the basis for finding a continuing pattern of criminal activity and thus grounds for a tremendous increase

in the sentence." (Appellant Br. 29.) Haskell argues that the state court's decision is "so arbitrary and unfair as to raise significant questions under the due process clause." *See, e.g.*, *Brecht v. Abrahamson*, 507 U.S. 619, 639 (1993). Haskell also argues that the state court's decision is "so broad" that it "offends due process as being so vague as not to provide defendants adequate notice of what might be punished." *See, e.g.*, *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999). Haskell contends that the state-court decision violates his Sixth Amendment right to trial by jury because the judge, not the jury, decided there was a pattern of criminal activity, which increased his sentence, although not beyond the statutory maximum. *See Blakely v. Washington*, 542 U.S. 961 (2004).

The district court did not grant a COA on this issue. "Rule 22(b)(2) provides that when an appellant fails to file an express request for a COA, the notice of appeal constitutes such a request to the judges of the court of appeals." *United States v. Cruz*, 108 F. App'x. 346, 348 (6th Cir. 2004). Haskell concedes that he has failed to certify this issue for appeal. (Appellant Rep. Br. 10-12.) His sole argument is that the Court should treat his notice of appeal as a request for a COA. (Appellant Rep. Br. 12.)

Generally, "a court of appeals will address only the issues which are specified in the [COA]" on habeas review. *See Searcy v. Carter*, 246 F.3d 515, 518 (6th Cir. 2001); *Johnson v. Bradshaw*, 205 F. App'x 426, 430 (6th Cir. 2007) ("We . . . limit our review to those issues identified in the [COA]."); *Hunt v. Mitchell*, 261 F.3d 575, 579-80 (6th Cir. 2001) (reviewing the "sole question[s]" presented to the Court on appeal). However, we have recognized our ability to grant a COA in the first instance at our own discretion. *See Hudson*, 421 F. App'x at 570 n.1.

20

Haskell concedes that he failed to ask this Court to review the district court's decision and that his counsel provides no reason for failing to comply with Rule 22's express language. These shortcomings are not fatal. His notice of appeal constitutes a request for a COA. *Castro v. United States*, 310 F.3d 900, 903 (6th Cir. 2002). Although we encourage "petitioners as a matter of prudence to move for a COA at their earliest opportunity so that they can exercise their right to explain their argument," we grant a COA on Haskell's third issue. *Id.*

Haskell argues that: (1) the state trial court's finding that four separate digital penetrations constituted continuing criminal activity was so arbitrary and fundamentally unfair that it deprived him of due process, and (2) the state trial court's determination that the continuing criminal behavior warranted a higher prison sentence violated his Sixth Amendment rights under *Blakely*.

## A. Due Process

Sentences violate due process if they are based on "misinformation of constitutional magnitude[,]" *Roberts v. United States*, 445 U.S. 552, 556 (1980), or "extensively and materially false" evidence that the defendant had no opportunity to cure. *Townsend v. Burke*, 334 U.S. 736, 741 (1948). "A state court's alleged misinterpretation of state sentencing guidelines and crediting statutes is a matter of state concern only." *Howard v. White*, 76 F. App'x 52, 53 (6th Cir. 2003). "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991); *see also Greer*, 264 F.3d at 675.

21

The Michigan Court of Appeals rejected Haskell's due process challenge as follows:

"And, regarding OV 13, continuing pattern of criminal behavior, the evidence clearly indicated that defendant committed three or more crimes against the victim within a five year period, i.e., the sentencing offenses . . . . Each forcible sexual penetration of the victim resulted in a separate conviction pursuant to the plain language of the statute and relevant case law. Therefore, the trial court did not abuse its discretion in counting each offense as part of defendant's pattern of criminal behavior and scoring OV 13 at twenty-five points. In sum, OV 2, 10, and 13 were scored correctly; thus, defendant's sentence is within the appropriate guidelines range and this issue is without merit."

*Haskell*, 2005 Mich. App. LEXIS 1531, at *23-24 (internal citations omitted).

The Michigan Court of Appeals' decision is not unreasonable. The jury found that Haskell sexually assaulted Russell on at least four occasions with either his fingers or his penis. That information is neither misleading nor materially false. The jury convicted Haskell on the basis of that evidence. The district court concluded that multiple penetrations constituted a pattern of behavior that warranted increasing Haskell's sentence within the Michigan guidelines. *See Haskell*, 695 F. Supp. 2d at 598. The "actual computation of [a prisoner's] term involves a matter of state law that is not cognizable under 22 U.S.C. § 2254." *Kipen v. Renico*, 65 F. App'x 958, 959 (6th Cir. 2003) (citing *McGuire*, 502 U.S. at 68).

Haskell cites a number of Supreme Court decisions to argue that the state trial court's sentence was fundamentally unfair. (*See* Appellant Br. 29) (collecting cases.) None of Haskell's cases addresses unfairness in the sentencing process, or supports his assertion that the trial court's finding of a "continuing pattern of criminal activity" violates due process. *See Abrahamson*, 507 U.S. at 639 ("[W]e conclude that the *Doyle* error that occurred at petitioner's trial did not

'substantially . . . influence' the jury's verdict."); *Doggett v. United States*, 505 U.S. 647, 657-58 (1992) (overturning a defendant's conviction because an approximately nine-year delay violated his Speedy Trial rights); *Darden v. Wainright*, 477 U.S. 168, 186 (1986) (affirming a defendant's conviction and death sentence); *Beardan v. Georgia*, 461 U.S. 660, (1983) (states may not use the poverty of a probationer as the sole justification for imprisonment). These decisions have no concrete application to this case. They do not address sentencing adjustments. They do not address what is required to establish a continuing pattern of criminal behavior. At best, they establish general rules. State courts have "even more latitude to reasonably determine that a defendant has not satisfied [general standards]." *Knowles*, 556 U.S. at 111.

Haskell contends that, if "continuing pattern of criminal behavior" is so broad as to include, as here, events that occurred within minutes, the concept offends due process because its vagueness denies defendants "adequate notice of what might be punished." (Appellant Br. 29-30.) Haskell also mentions in a footnote, without development, that this argument "can also be phrased as a matter of double jeopardy." *Id.* at 30 n.3. Haskell did not exhaust either his vagueness or double-jeopardy claims in state court; for example, neither argument is mentioned in any of his briefs to the Michigan Court of Appeals or the Michigan Supreme Court. Thus, we will not consider these arguments unless Haskell can show cause and actual prejudice. He offers no reason to believe that procedural default can be overcome in this instance.

## B. *Blakely v. Washington*

Haskell contends that the state trial court's finding of a pattern of criminal behavior increased his sentence beyond the statutory maximum permitted by the jury's verdict and violated his Sixth Amendment rights. In *Blakely*, the Supreme Court invalidated a Washington sentencing scheme that permitted judges to impose sentences above standard guideline ranges if they found "substantial and compelling reasons justifying an exceptional sentence." *Id.* at 299. The defendant in *Blakely* was sentenced to more than three years above the 53-month statutory maximum of the standard range because he had acted with "deliberate cruelty." *Id.* at 303. The Supreme Court held that this increase violated the principle that, "'[o]ther than a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.'" *Id.* (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)); *see also id.* ("When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts which the law makes essential to the punishment, and the judge exceeds his proper authority.") (internal citations omitted). In *Cunningham v. California*, 549 U.S. 270, 274 (2007), the Supreme Court invalidated a California sentencing scheme that placed sentence-elevating fact-finding within the province of individual judges. *Id.* at 274.[4] The Court affirmed that it had "repeatedly held that, under the Sixth Amendment, any fact that exposes a defendant to a greater potential sentence must be found by a jury, not a judge, and established beyond a reasonable doubt, not merely by a preponderance of the evidence." *Id.*

---

[4]California had a determinate sentencing scheme. 549 U.S. at 274.

In contrast to the sentencing laws at issue in *Blakely* and *Cunningham*, Michigan has an indeterminate sentencing scheme. The maximum sentence in Michigan is determined by law, not the trial judge. *See, e.g.*, *Chontos v. Berghuis*, 585 F.3d 1000, 1001 (6th Cir. 2009) ("Under the Michigan sentencing scheme, a particular criminal offense carries with it a statutory maximum penalty set by the legislature."); *see also People v. Drohan*, 475 Mich. 140, 160-61 (2006). "[M]ichigan's sentencing guidelines, unlike the Washington guidelines at issue in *Blakely*, create a range within which the trial court must set the minimum sentence." *Drohan*, 475 Mich. at 161. Under Michigan law, only the minimum sentence must presumptively be set within the appropriate sentencing guidelines range. *See Deatrick v. Sherry*, 451 F. App'x 562, 564 (6th Cir. 2011) ("[T]he *Apprendi/Blakely* line of cases is not implicated by Michigan's statutory scheme because judicial fact-finding increases the minimum sentence, rather than the maximum sentence."); *see also People v. Babcock*, 469 Mich. 247, 255 n.7 (2003). The trial judge can never exceed the maximum sentence. *Id.*

*Blakely* does not apply to indeterminate sentencing schemes. 542 U.S. at 304-05 (concluding that *Blakely* does not apply to sentencing schemes that do "not authorize a sentence in excess of that otherwise allowed for [the underlying] offense."). Cases addressing indeterminate sentencing regimes do not "involve[] a sentence greater than what state law authorized on the basis of the verdict alone," and thus are not limited by *Blakely*. *Id.* "Indeterminate sentencing . . . increases judicial discretion, to be sure, but not at the expense of the jury's traditional function of finding the facts essential to lawful imposition of the penalty." *Id.* at 309-10. The record demonstrates that

25

Haskell's sentences are well within the statutory maximum for each offense of conviction. Haskell

has failed to show a *Blakely* violation.

## VI.  CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.

**MERRITT, Circuit Judge, dissenting.** The jury returned an unusual verdict saying that Haskell was "mentally ill" but did not meet the quite different standards for the insanity defense, a defense at odds with automatism. I believe that if Haskell's counsel had presented his automatism defense (a form of unconsciousness) as negating the mens rea or intent element of the case, the jury may well have returned a verdict of not guilty because of the absence of intent. By virtue of the failure of both Pluckett and Resnick, as counsel, to raise the automatism defense to the element of intent, the jury required Haskell to meet the different theory of insanity charged by the court as an affirmative defense.

This occurred because neither lawyer in the case had any conception of how the particular mental illness should affect the elements of the crime and did not understand the *mens rea* requirement. The first lawyer, Pluckett, was a drug addict with a record of legal malpractice and completely ineffective as a lawyer in the case. He was confused beyond repair. He left the case immediately before the trial. The substitute lawyer was in a difficult situation in having but little time to prepare for the trial. Nevertheless, Resnick should obviously have understood that the automatism defense went to intent or *mens rea* and did not support a standard for insanity under the Michigan law. It certainly did, however, negate the element of intent under Michigan law. The fact that the jury returned the "mentally ill" defense strongly indicates that it accepted the automatism defense — the only "mental illness" raised in the case.

Usually the most important work of a criminal defense lawyer is to develop a plausible defense theory. Here, there was an obvious theory that would have negated intent as a result of

27

"mental illness," a fact that the jury found, but could not apply to insanity. The defense lawyers were so ineffective that they never gave the jury an opportunity to consider it as undermining intent. I would put that kind of lawyer malpractice on an equal plane with the lawyer who sleeps through the trial in the sense that the lawyer was unfocused on the case and therefore unable to make a rather obvious decision to use the type of "mental illness" the jury found to negate intent.

For purposes of *Strickland v. Washington*, 466 U.S. 668 (1984), the failure to assert an obvious defense to an element of the crime — intent — constitutes deficient performance. Competence requires a basic conception of the elements of the crime and how lawyers must go about casting doubt on *mens rea* which the state has the burden of establishing. Instead counsel chose to carry the heavy burden of proving the affirmative defense of insanity which includes proof of the defendant's lack of capacity to understand the difference between right and wrong. Where the jury finds the facts in favor of the automatism defense ("mental illness") but is unable to apply it because defense counsel did not correctly point out the element of the crime that it would undermine, prejudice is clear. Lawyers can be incompetent because they do not understand the law as well as incompetent because they do not develop the facts.